UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**07 CV 4078**

-----------------------------------------------------------x

JOHN O. MYERS,

                          Plaintiff,                No.                **JUDGE HOLWELL**

            – against –

HSBC INVESTMENTS (USA) INC.; HSBC                    **COMPLAINT**
NORTH AMERICA HOLDINGS INC.; HSBC
SECURITIES (USA) INC.; HSBC FINANCE
CORPORATION; and HSBC HOLDINGS PLC,                  **Jury Trial Demanded**

                          Defendants.                       MAY 2 4 2007

-----------------------------------------------------------x

    Plaintiff John O. Myers ("Mr. Myers") by his attorneys, Fensterstock & Partners LLP, for his

complaint alleges as follows:

## INTRODUCTION

    1.    This case arises out of Defendants' unlawful violation of (a) the Age Discrimination

in Employment Act, 29 U.S.C.A. §§ 621, 623 et. seq. ("ADEA"); (b) the New York State Human

Rights Law, Executive Law § 296 et. seq.("Executive Law'); (c) the Administrative Code of the City

of New York § 8-107, et. seq. ("Administrative Code"); and (d) HSBC's own policies, resulting in

the discriminatory and unlawful termination of John O. Myers from his position as Head of

Intermediary Sales of HSBC Investments (USA) Inc., based solely on his age. Defendants have also

unlawfully retaliated against Mr. Myers in violation of (a) 42 U.S.C.A. § 2000e-3 ("Title VII"); (b)

29 U.S.C.A. § 621, et. seq.; (c) Executive Law §§ 296(1)(e) and 296(7); and (d) Administrative Code

§§ 8-101(7).

2.      Mr. Myers's unlawful termination was cloaked under the veil of a "reorganization" when in fact it was the result of HSBC's desire to rid themselves of Mr. Myers, based on his age.

3.      At the time Mr. Myers learned of his unexpected and devastating termination, effective January 27, 2007, Mr. Myers was 59 years old and had been a "faithful servant" to HSBC since June 1999. He has an extensive financial background and while employed by HSBC, consistently earned good to excellent performance evaluations, including a "President's Award" in 2005, as well as significant performance-based bonuses.

4.      On December 13, 2006, Mr. Myers received a letter from HSBC dated December 12, 2006 ("Termination Letter") officially notifying him of his termination. On December 7, when Mr. Myers first learned from Steve Baker, his immediate supervisor and the Chief Executive Officer of HSBC Investments (USA) Inc., that Mr. Baker would soon be delivering this letter to Mr. Myers, Mr. Baker told Mr. Myers that there were no other available openings within HSBC for him. At that time, Mr. Myers told Mr. Baker that he had intended to, and would still like to, continue to work for HSBC until a conventional age of retirement. In response, Mr. Baker stated that, "well, we know that's not going to happen," despite the fact that HSBC prides itself on favoring internal candidates in the hiring process and there were various positions available within HSBC for which Mr. Myers was more than qualified.

5.      As numerous executives at HSBC will confirm, when he learned of his pending termination, Mr. Myers was diligent in seeking employment elsewhere within HSBC. In that effort, he met and conferred with, among others, Mr. Baker; Karen Ferris, Senior Vice President, Head of CIBM Human Resources.; Joanna Munro, Global Chief Investment Officer of HSBC Investments; and Andy Ireland, Executive Vice President, Premier Banking, Investments and Insurance, Managing

Director, Head of Private Client Services, HSBC Securities (USA) Inc. Mr. Myers asked to be considered for several positions within HSBC, including: (a) the Chief Investment Officer of HSBC Investments (USA) Inc. ("CIO"), a role which required management of the liquidity and multi-manager teams, providing investment solutions to clients and customer groups, and contributing at the global level to investment policy discussions; (b) the Head of the Third Party Distribution Project, which required development of business through generating subadvisory appointments with third party institutions; (c) the Product Manager role, which required supervising the Investment Specialists and coordinating internal and external product providers, resources and specialists; (d) the Investment Specialist position, which focused on training and coaching the financial advisors on the product details and sales processes for investment products; and (e) an institutional sales role relating to the Private Bank for HSBC Investments. With regard to his numerous requests for consideration, Mr. Myers was rejected as being "overqualified," without "fresher contacts," and that one of the positions was "beneath" him.

6.      In reality, HSBC created a mirror organization of Mr. Myers's group in which the job descriptions and responsibilities in that organization are virtually identical to that which existed before. For this group, HSBC is considering or has hired candidates significantly younger than Mr. Myers, despite Mr. Myers's expressed interest in the "new" positions and his extensive qualifications and accomplishments.

7.      The examples of age discrimination against Mr. Myers are numerous and egregious. For example, Mr. Myers was told by several individuals involved in the decisions to discriminate against him that he was "overqualified" for certain available positions at HSBC, that a certain other available position was "beneath" him, and that HSBC was intent on establishing a "young and

energetic" group. Mr. Myers also was told that it was ridiculous, that he, at this stage in his career, would have to get an additional Series 66 license, something he was ready, willing, and able to do.

8.    On December 16, 2006, Mr. Baker, who was intricately involved in the decision making process to discriminate against Mr. Myers, told Mr. Myers, after stating "you have to be careful what you say in the States," that if Mr. Myers were "20 years younger," he would consider a change in assignment for Mr. Myers. When Mr. Myers told Mr. Baker that he feels younger than his age and has many years ahead of him, Mr. Baker did not dispute that, but instead responded, "that's because you have all those kids."

9.    In addition to violating the age discrimination laws, HSBC also violated its own employment policies, despite promising Mr. Myers expressly in his contract of employment, signed by Mr. Myers on June 18, 1999, that it would "always comply with the applicable law as well as with its policies as outlined in the Employee Manual and HSBC Asset Management Instruction Manual." Mr. Myers's contract of employment expressly incorporates the HSBC Employment Manual and policies into its terms.

10.    In the HSBC Employment Manual, HSBC declares that it "values diversity" and "nurtures individual growth regardless of age, color, creed, disability, marital status, sexual preference, national origin, race, religion, sex, veteran status, or alienage," that it "aims to foster a work environment that embraces and recognizes the benefit and value inherent in the diverse characteristics of all people, such as age, color, creed, disability . . .", and promises its employees, including Mr. Myers, that it will "employ the best candidate for each job and to conduct the search for open positions in a non-discriminatory manner by examining internal and external sources. Selection of internal or external candidates will be guided by the [HSBC's] policy on Equal

4

Employment Opportunity." The Employee Manual further states that it is HSBC's policy to "employ the best candidate for a job based on merit, qualifications, and demonstrated ability among qualified candidates, including current employees."

11.    HSBC also promised its employees on its website, including Mr. Myers, that "[e]qual opportunity extends to all aspects of the employment relationship, including hiring, transfers, promotions, training, terminations . . . and other terms and conditions of employment," that internal candidates should be given preference when practical, for promotions from within, and further, that a termination can be approved, only when "all other options have been explored and rejected," for proper and lawful reasons.

12.    Mr. Myers, 59 years old, is a member of a protected class because he is over 40 years old. Mr. Myers is more than qualified for available positions within HSBC that he was rejected from subsequent to his unlawful termination, which was based solely on his age.  HSBC has made blatantly discriminatory remarks to Mr. Myers, and it has engaged in a hiring process that is contrary to its own stated policies, as reflected in its consideration and hiring of candidates markedly younger than Mr. Myers.

13.    HSBC has blatantly ignored Mr. Myers's qualifications and requests for alternate employment within HSBC, and instead, decided to put a man of Mr. Myers's age "out to pasture," stating among other things, that perhaps it was time for him to leave the active corporate world and do something like opening a tea shop in the American equivalent of the English countryside.

14.    As a result of these discriminatory actions, based entirely on Mr. Myers's age, Mr. Myers has suffered damages in excess of $3,090,610.

## PARTIES

15.    Plaintiff John O. Myers is a 59 year old individual residing at 43 Love Lane, Brooklyn, New York 11201.

16.    Defendant HSBC Investments (USA) Inc. ("HSBC Investments") is a New York corporation with its principal place of business located at 452 Fifth Avenue, New York, New York 10018.

17.    Defendant HSBC North America Holdings Inc. ("HSBC North America") is the North American parent company of HSBC Investments and HSBC Securities, among others. Its principal place of business is located at 2700 Sanders Road, Prospect Heights, Illinois 60070.

18.    Defendant HSBC Securities (USA) Inc. ("HSBC Securities") is a New York Corporation with its principal place of business located at 452 Fifth Avenue, New York, New York 10018.

19.    Defendant HSBC Finance Corporation ("HSBC Finance") is a subsidiary of HSBC North America with its principal place of business located at 2700 Sanders Road, Prospect Heights, IL 60070.

20.    Defendant HSBC Holdings Plc. ("HSBC Holdings") is the largest bank in the world by assets (as of August 2006), with more than 10,000 offices in 82 countries, and is the parent company of all North American HSBC subsidiaries.  Its principal place of business is located at 8 Canada Square, London E14, 5HQ, United Kingdom.

21.    The above named Defendants shall be referred to collectively, and without distinction, as "HSBC."

6

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over the subject matter of this action pursuant to (a) 28 U.S.C. § 1331 because the plaintiff's claims raise federal questions; and (b) 28 U.S.C. § 1367 because the remaining state law claims are so related to the federal claims that they form part of the same case or controversy.

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

24.     Pursuant to § 8-502(c) of the Administrative Code of the City of New York, prior to filing this Complaint, plaintiff served a copy of the Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

## JURY DEMAND

25.     Plaintiff demands a jury trial.

## STATEMENT OF FACTS

26.     Mr. Myers began his employment with HSBC on June 22, 1999.  To date, Mr. Myers has over 23 years experience as a senior financial services executive. Prior to his employment with HSBC, Mr. Myers was employed by a leading insurance and financial service provider as Senior Vice President, where he was involved with business development, distributor relationship management, wholesaler recruiting and management, and sales.  Mr. Myers was also employed by a prominent United States bank's full service broker/dealer distributor and worked as its President and Chief Executive Officer.

27.     Mr. Myers first applied his notable prior financial experience to his employment with HSBC by  working for HSBC as Chief Executive Officer within HSBC Asset Management

Americas, Inc., now known as HSBC Investments (USA) Inc., and was a member of the Global Management Committee. As Chief Executive Officer, Mr. Myers had profit and loss responsibilities for the United States organization, including sales and marketing, investment management, operations and administration, as well as general management responsibility.

28.    On June 18, 1999, Mr. Myers signed a written agreement dated May 29, 1999 with Susie Babani, HSBC's Global Head of Human Resources, confirming HSBC's offer of employment and detailing the terms of Mr. Myers's employment with HSBC.

29.    In his employment contract, signed by Mr. Myers on June 18, 1999, HSBC represented to Mr. Myers that HSBC would "always comply with the applicable law as well as with its policies as outlined in the Employee Manual and HSBC Asset Management Instruction Manual."

30.    The employment contract guaranteed Mr. Myers an annual base salary, bonus, units of restricted stock, and employee benefits.

31.    In 1999 and 2000, Mr. Myers was guaranteed a base salary of $300,000 and a $300,000 bonus through December 2000. Based on his excellent performance, Mr. Myers's compensation exceeded that each year. In 2002, his payment structure changed when, as a result of HSBC's acquisition of Republic Bank, Mr. Myers was made Head of Intermediary Sales at HSBC.

32.    When Mr. Myers changed positions within HSBC, his annual salary, including base salary and bonus structure, was cut. At that time, Mr. Myers considered the possibility of discontinuing employment with HSBC, considering his family and financial situation, and given that he had originally negotiated to work for HSBC and move his family from Charlotte, North Carolina for a significantly higher salary. Even though he had two children in college and one in boarding school at the time, Mr. Myers stayed with HSBC, reasoning that in consideration of the quality of

the non-financial aspects of HSBC, Mr. Myers could make things work by continuing to work until age 65, or longer, if necessary. Despite a decrease in salary, Mr. Myers remained faithful to HSBC and continued to perform admirably. Unfortunately, despite Mr. Myers's loyalty to HSBC, he was not given the chance to make things work, and was instead unlawfully terminated by HSBC due to age discrimination effective January 27, 2007.

33.    While employed by HSBC, Mr. Myers continually earned significant bonuses and often received praise for the quality of his work and his command of detail. Mr. Myers was always well-respected by his peers. Since 2002, Mr. Myers's compensation has remained at approximately $400,000 per year, with good to excellent performance evaluations, including earning a prestigious President's Club award in 2005.

34.    In a 2000 performance review, Mr. Myers was described as having a "combination of affability and drive that is unique."

35.    In an August 16, 2006 feedback report, Mr. Myers was evaluated by his peers, manager, and direct reports. Mr. Myers was described by those evaluating him as being "highly respected by peers and employees," whose "deep experience in his business area makes him an excellent role model for his team members," who "looks for new and innovative ways to increase the product line," and who "maintains excellent rapport with key stakeholders and sales team. . . [and] [h]as built strong partnership with insurance colleagues." Among his key strengths, his manager, Mr. Baker, identified his sales management skills and knowledge of the industry/business.

36.    During a performance evaluation on December 16, 2005, Mr. Myers met with his direct supervisor, Steve Baker, Chief Executive Officer of HSBC Investments. When Mr. Myers initiated the topic of the possibility of his assuming a different role within HSBC, Mr. Baker first

said, "you have to be careful what you say in the states," and then told Mr. Myers that if "you were 20 years younger [Baker] would consider this change in assignment." When Mr. Myers told Mr. Baker that he felt much younger than his age at the time, 58, and that he had many years ahead of him, Mr. Baker did not dispute that, but instead stated "that's because you have all those kids." Mr. Myers is the devoted father of six children.

37.     During the same December 16, 2005 performance evaluation, Mr. Baker told Mr. Myers that his activity that year had been excellent.

38.     In 2006, when Mr. Myers told Mr. Baker that the introduction of HSBC's Managed Portfolio Account product would require Mr. Myers to get an additional Series 66 RIA license in addition to the licenses he already held, Mr. Baker said it was "ridiculous that a person at your stage of your career should be needing to get another license."

39.     On December 7, 2006, Mr. Myers received from Mr. Baker the devastating and unexpected news that his employment with HSBC would be terminated, effective January 27, 2007. At the time of his shocking termination, Mr. Myers was employed as the Head of Intermediary Sales at HSBC.

40.     At the time Mr. Baker told Mr. Myers that Mr. Myers and his entire wholesaling team would be terminated, he also informed Mr. Myers that he, Baker, would not have another position for him at HSBC, even though there were various open positions at HSBC, for which Mr. Myers was more than qualified. However, Mr. Baker told Mr. Myers that he would be paid his 2006 bonus, would be considered to be in "good leaver" status, would keep his current unvested shares of restricted stock, and his pension would become fully vested.

41.     Mr. Baker volunteered many times during the December 7, 2006 conversation

between Mr. Myers and Mr. Baker, that Mr. Myers had been a "faithful servant" of HSBC, had great performance, had a great year in 2006, and was one of the most positive persons that Mr. Baker had ever met. Mr. Baker promised to write a very positive performance evaluation for Mr. Myers.

42.    Mr. Baker informed Mr. Myers that he was planning to start a Third Party Distribution initiative and that he, with colleagues Alain Dromer and Farley Thomas, had considered Mr. Myers for the role, but disregarded him because they felt they needed someone with "fresher" contacts.

43.    On December 12, Mr. Myers expressed his interest in the Head of Third Party Distribution. Mr. Baker recognized that Mr. Myers had previous relevant experience, and stated that he had "no doubt that [Mr. Myers] could do this job well."

44.    When Mr. Myers told Mr. Baker that he wanted to continue to work for HSBC until a conventional retirement age of 65 or 66, Mr. Baker flatly informed Mr. Myers that "well, we know that isn't going to happen." Mr. Baker further indicated, among other things, that perhaps it was time for Mr. Myers to leave the active corporate world and do something like opening a tea shop in the American equivalent of the English countryside.

45.    On December 11, 2006, in a meeting with Mr. Myers, and the wholesaling team, Mr. Baker announced that there would be new "Investment Specialist" jobs in the broker/dealer division that were going to have a manager. The manager role had not been filled at that time. Mr. Baker informed the wholesalers that they would be candidates for the investment specialist jobs.

46.    Ironically, this new group is a mirror organization of the group of which Mr. Myers and the wholesalers were a part. In fact, Mr. Myers was enlisted by HSBC's Human Resource Department to provide the job descriptions for the new positions. The descriptions for the "new"

wholesaler positions are virtually identical to the existing wholesaler job descriptions and have identical job responsibilities.

47.    During the December 11 meeting, Mr. Baker told the wholesalers and Mr. Myers: "I know this is hard on all of you, and hard on [Mr. Myers]- in fact harder on [Mr. Myers], in that you are all at an earlier stage in your careers to pursue other opportunities."

48.    Later in the day of December 11, 2006, Mr. Myers sent Mr. Baker an email making it clear that he too was interested in being considered for the management job, and for the Investment Specialist roles.

49.    On December 13, 2006, Mr. Myers received a letter dated December 12, 2006 ("Termination Letter"), in which he was informed that his employment with HSBC would be terminated effective January 27, 2007.

50.    Mr. Myers had a meeting with Mr. Baker on December 13, during which Mr. Baker delivered the Termination Letter.  During this conversation, Mr. Myers expressly told Mr. Baker that he would like to be considered for the open Chief Investment Officer ("CIO") position within HSBC Investments, as well as the Investment Specialist Supervisor position and the Investment Specialist positions themselves.  In response, Mr. Baker told Mr. Myers that he was "overqualified" for the Investment Specialist positions.  Mr. Baker also told Mr. Myers that Andy Ireland, Executive Vice President, Premier Banking, Investments and Insurance, Managing Director, Head of Private Client Services, HSBC Securities (USA) Inc., wanted to hire people from outside of HSBC for the newly formed positions.  This is in direct contradiction to HSBC's stated policy to attempt first to hire internal candidates from within.

51.    Further, when Mr. Myers pointed out to Mr. Baker that there were at least four open

12

positions for which he was qualified, Mr. Baker told him there were no available positions for Mr.
Myers, and that "Andy [Ireland] basically wants to hire the people from the outside into these newly
formed positions."

52.     Section 120 of the Employee Manual, states that HSBC "values diversity" and
"nurtures individual growth regardless of <u>age</u>, color, creed, disability, marital status, sexual
preference, national origin, race, religion, sex, veteran status, or alienage." Section 120 also states
that HSBC "aims to foster a work environment that embraces and recognizes the benefit and value
inherent in the diverse characteristics of all people, such as <u>age</u>, color, creed, disability . . .".

53.     In Section 201 of its Employee Manual, HSBC promised its employees, including Mr.
Myers, that it would "employ the best candidate for each job and to conduct the search for open
positions in a non-discriminatory manner by examining internal and external sources. Selection of
internal or external candidates will be guided by the [HSBC's] policy on Equal Employment
Opportunity." Section 836 of the Employee Manual further states that it is HSBC's policy to
"employ the best candidate for a job based on merit, qualifications, and demonstrated ability among
qualified candidates, including current employees."

54.     HSBC also promised its employees, including Mr. Myers, that "[e]qual opportunity
extends to all aspects of the employment relationship, including hiring, transfers, promotions,
training, terminations . . . and other terms and conditions of employment," that internal candidates
should be given preference when practical, for promotions from within, and further, that a
termination can be approved, <u>only when</u> "all other options have been explored and rejected," for
proper and lawful reasons.

55.     When Mr. Myers spoke with Mr. Baker regarding how Andy Ireland might view Mr.

13

Myers as a candidate for the Product Manager role, Mr. Baker responded by saying "I think he will consider that this job is beneath you. And that you should be shooting for a position of CEO or CIO rather than this, and as you know, I agree with that view."

56.     On December 19, 2006, Mr. Myers attended a Local Management Committee Meeting, during which Mr. Baker recognized the effort and contributions of Mr. Myers and his team. Mr. Baker stated that "[t]hey are actively trying to find other positions within the Group" even though Mr. Baker had previously told Mr. Myers that he did not have an open position for him and that Mr. Myers would not work at HSBC until retirement.

57.     On December 21, 2006, Mr. Myers interviewed by phone with Joanna Munro, based in London, for the CIO position. Ms. Munro told Mr. Myers that HSBC was looking for a "young and energetic" group. Mr. Myers did not get the CIO position, despite his qualifications and previous experience.

58.     On December 22, 2006, Mr. Myers interviewed with Andy Ireland, Executive Vice President, Premier Banking, Investments and Insurance, Managing Director, Head of Private Client Services, HSBC Securities (USA) Inc., for the open Product Manager role. Mr. Myers was qualified for the position, as he had breadth of experience and a track record of success managing both product and distribution, covering a wide range of products, and managing wholesalers across multiple channels and multiple products.

59.     On January 4, 2007, Mr. Myers spoke with Bruce Pflug, Head of Institutional Sales for HSBC Investments (USA), regarding the available head position in the Third Party Distribution Project. Mr. Pflug told Mr. Myers that he thought Mr. Myers would be great in the role as head of the new Third Party Distribution Project. Mr. Pflug described Mr. Myers as "a low risk choice for

14

[the] project," and as having "integrity and focus." The same day, Mr. Myers wrote Mr. Baker an email to express formally his interest in assuming the role. Mr. Myers was more than qualified to assume the role.

60.    In response, Mr. Baker told Mr. Myers in an email on January 6, 2007, that HSBC wanted to "widen the search to include external candidates." As previously mentioned, it is HSBC's policy to look first to hire internal candidates from within HSBC.

61.    Upon information and belief, to date, the head of the third party distribution role has not been filled. On December 19, 2006, a colleague of Mr. Myers, Steven Plump, spoke with Mr. Baker regarding the role and was told by Mr. Baker that the third party distribution role had been "scaled back considerably" and that HSBC was looking for someone "significantly more junior."

62.    Mr. Myers exercised remarkable diligence in seeking another job within HSBC. In addition to speaking to Mr. Baker, Mr. Myers also spoke with Joanna Munro on December 21, 2006; Olivier Gayno on December 22, 2006; Leon Goldfeld on January 8, 2007; Andy Ireland on December 22, 2006 and January 16, 2007; and Bruce Pflug on January 4, 2007, all of HSBC, regarding available positions within the company.

63.    On January 5, 2007, Thuy Nguyen, a member of the HSBC Human Resources Department enlisted Mr. Myers's assistance to create job descriptions for the "new" Investment Specialist positions. Nguyen requested the wholesaler job descriptions that Mr. Myers had developed in the past, and the descriptions for the "new" positions are identical to those of the prior wholesaler job descriptions, the only exception being that the "new" positions will deal with a broader range of products. Richard Palmer, Esq., of HSBC, confirmed the correlation between the positions on February 12, 2007.

64.    On January 10, 2007, Mr. Myers again contacted Andy Ireland to convey his interest in the open Product Manager role, as well as the Investment Specialist positions.

65.    Mr. Myers spoke with Andy Ireland on January 16, 2007, and again discussed the possibility of Mr. Myers assuming the Product Manager role, which would supervise the Investment Specialists. At that time, Mr. Ireland told Mr. Myers that he already had someone in mind for the Product Manager position, and that the person would be selecting the Investment Specialists. Mr. Myers was told that it would be the new Product Manager's first priority to hire the Investment Specialists with Mr. Ireland stating, "[w]hen he comes on board that will be his first priority. I always want to favor internal candidates."

66.    On January 18, 2007, Mr. Myers contacted Bruce Pflug by e-mail, copying Steve Baker, to express his interest in the Private Banking Sales role within institutional sales that had become available.

67.    On January 19, 2007, HSBC published an announcement regarding the strengthening of its institutional sales effort through Corporate Banking, as well as the third party distribution effort. The announcement indicated that there were several new hires and promotions. One position described a job responsibility as serving as the day-to-day contact for Corporate Banking Relationship Managers. It was by those exact means that Mr. Myers accomplished sales and added $3 billion in institutional money market assets to HSBC while he served as temporary Head of Institutional Sales at HSBC in 2002-2003.

68.    In an act of unlawful retaliation, Mr. Baker never provided Mr. Myers with the end of year performance that he had promised Mr. Myers he would prepare. However, in Mr. Myers's September 11, 2006 mid-year review, Mr. Baker described Mr. Myers's performance as "overall .

. . achieving or exceeding expectations." As of September 11, 2006, Mr. Myers was ahead of year-to-date sales plans in Investor Fund and MPA Sales. Mr. Baker also stated that Mr. Myers made an "excellent contribution" to platform wholesaling, "continue[d] to demonstrate leadership," "made a significant contribution" as the regional representative on the Global INVolve Working Party, and "maintain[ed] the highest standards of conduct and integrity."

69.    In Mr. Myers's Intermediary Sales Report dated January 18, 2007, HSBC reported that the 2006 sales for all products stood at 27% over plan.

70.    Mr. Myers is entitled to "good leaver" status, which entitles him to his restricted shares as they vest, valued at approximately $275,000, and entitles him to exercise, for varying periods after termination, 8,400 stock options that he holds, valued at approximately $21,104.

71.    Despite Mr. Baker's representation to Mr. Myers on December 7, 2006 that he would be considered a "good leaver," Richard Palmer, Esq., of HSBC shared, in an April 25, 2007 telephone conversation that Mr. Myers's restricted stock awards would not be released to him because he was not a "good leaver." Mr. Palmer explained that HSBC had declared that Mr. Myers was not a "good leaver" because (a) he had not signed the HSBC Separation Agreement, and (b) he had "filed a claim against [HSBC]."

72.    On January 26, 2007, Mr. Myers learned that HSBC had extended the employment of one of Mr. Myers's wholesalers, John Schiro, who was also set to be terminated effective January 27, 2007, because he was on track for the institutional role relating to the private bank. Mr. Schiro, as a wholesaler, reported to Mr. Myers. Mr. Schiro is 40 years old. Mr. Myers, who was then 59 years old and Mr. Schiro's manager, had applied for the same job. Not only was Mr. Myers's employment not extended pending determination of any of his applications, but he had not even

17

received a response to his application for the same job.

73.     Mr. Schiro got the institutional sales role relating to the private bank. When Mr. Myers spoke with John Schiro on February 27, 2007, Mr. Schiro stated that "nobody would ever hire [Mr. Schiro] into an institutional sales role" and that he had little qualification for the institutional aspects of the job. In contrast, Mr. Myers's institutional experience and qualifications for the job are substantial.

74.     Upon information and belief, as of January 31, 2007, Jim Detmer joined HSBC as Senior Vice President, Product Management and Development, the role for which Mr. Myers also applied. HSBC announced that prior to joining HSBC, Detmer worked for JPMorganChase, where he was most recently Head of Broker Dealer Business, with "responsibility for wholesale distribution of JPMorgan separate accounts and mutual fund sales." This description of job responsibilities is exactly the same as Mr. Myers's job at HSBC prior to his termination.

75.     In a February 15, 2007 interview with Detmer for one of two Investment Specialist positions, Detmer revealed to Mr. Myers that he had always been on the asset management side of the business, selling products to the distributors. Now, for the first time, Detmer would be buying products from asset management firms, despite the fact that Andy Ireland told Mr. Myers that he needed someone who could bring together the asset management side and the broker/dealer side, in other words, someone with both buying and selling experience. Mr. Myers had both buying and selling experience while Detmer did not.

76.     Mr. Myers was later informed by HSBC that he had not been chosen for the Investment Specialist position, for which he was told earlier that he was "overqualified." Mr. Myers was told that HSBC wanted an *investment product* wholesaler (meaning one that could wholesale

both mutual funds and annuities), not just a *mutual fund* wholesaler, and that HSBC was looking for a *wholesaler*, while HSBC said, Mr. Myers had only *managed* wholesalers. With regard to Mr. Myers's experience, HSBC failed to consider that Mr. Myers had four years experience, in previous employment, in running the wholesaling of annuities and insurance, this in addition to his many years of experience at other firms with mutual funds. Further, Mr. Myers had been in constant demand within the HSBC network to provide direct wholesaling coaching, training, and sales. As a wholesaler manager, Mr. Myers was more than qualified to do the work of a wholesaler.

77.    Upon information and belief, the Chief Investment Officer position for which Mr. Myers applied, and was told that HSBC was looking for a "young and energetic" group, has been filled by Simona Paravani.

78.    On February 12, 2007, Richard Palmer, Esq., of HSBC, responding to a letter from Mr. Myers's counsel, which provided numerous specific instances of age discrimination against Mr. Myers in violation of federal, state, and local law, as well as in violation of HSBC's employment policies, stated that "nothing in the letter was flatly wrong." Mr. Palmer admitted that the job descriptions of the "mirror image" group were indeed similar to those of Mr. Myers's eliminated group, and that the jobs will be similar in responsibilities, the only minor difference being a broader range of products.

79.    Mr. Palmer also stated in that conversation that Mr. Baker had admitted to him the conversation regarding the "tea shop."

80.    Mr. Palmer also stated that "no one thought [Mr. Myers] was a bad employee," that "everyone liked, trusted, and respected [Mr. Myers]," and that they, meaning HSBC, were "not pleased about letting him go."

19

81.    Mr. Palmer also declared that, at HSBC, he has "been through this with a lot of other business groups," and that "it's always with a lot of older folks, women, and other diversity groups."

82.    Mr. Palmer made the representation that HSBC would pay for Mr. Myers's COBRA through the end of March 2007. However, HSBC's Termination Letter promised Mr. Myers six months of COBRA continuation coverage.

83.    Despite such written and verbal assurances, on February 23, 2007, Mr. Myers received an invoice from COBRA showing that he owed $2,318.54 for coverage through the end of March 2007. Mr. Palmer failed to return three phone calls inquiring into the discrepancy, made on February 22, February 26, and February 28.

84.    Due to HSBC and Mr. Palmer's continued unresponsiveness, on February 28, 2007, Mr. Myers had no choice but to file a charge with the Equal Employment Opportunity Commission ("EEOC"), outlining specific instances of age discrimination against him by HSBC.

85.    On March 3, 2007, Mr. Myers made the worrisome discovery that he and his dependents were without medical coverage. Further, on March 8, he received a hospital bill from a February visit because, on the date of his visit, his "contract was not in effect on date of service." Upon further research, Mr. Myers discovered that his policy had been cancelled.

86.    In a telephone conversation on March 8, 2007, Mr. Palmer. admitted that HSBC had made a mistake, that HSBC would reinstate the medical coverage retroactively, and again promised that HSBC would pay for Mr. Myers's medical coverage through the end of March. Also, by e-mail on March 8, Mr. Palmer represented that Mr. Myers's COBRA coverage had been reinstated through the end of March.

87.    Unfortunately, this was untrue, again. On March 22, 2007, Mr. Myers attempted to

20

fill a prescription for his wife, who had become ill after traveling, and Mr. Myers was informed that his family prescription coverage had expired on February 28, 2007. Mr. Myers learned that HSBC, in direct contradiction to its assurances, had not paid for Mr. Myers's COBRA coverage.

88. As a result of HSBC's failure to keep its promises to Mr. Myers, Mr. Myers personally incurred costs for COBRA premiums for February and March, and prescription costs. If he had not paid the premiums before April 1, his coverage would have been cancelled without possibility of reinstatement. As of March 28, Mr. Myers still did not have any prescription coverage.

89. On April 2, 2007, Mr. Palmer, by e-mail, represented that, as of April 2, Mr. Myers's COBRA coverage, "paid by HSBC, ha[d] been reinstated from Feb. 1, 2007 through the end of April, 2007."

90. HSBC again fell short of fulfilling its promises. Despite the assurance that HSBC would reinstate Mr. Myers's COBRA coverage for the months of February, March, and April, HSBC paid only two, rather than the promised three, months of COBRA coverage. To date, Mr. Palmer has not responded to the inquiry made into this inconsistency on April 4, 2007.

91. Mr. Myers expected to work for HSBC until his retirement, at age 66. As a result of his discriminatory termination, he has lost annual earnings, including base salary, cash awards, and restricted stock awards, benefits including HSBC paid medical and dental coverage, 401K matching, Basic Life Coverage, and HSBC Total Rewards compensation, retirement, and health and welfare benefits. By terminating Mr. Myers despite his demonstrated competence, loyalty and commitment to HSBC, and before his intended retirement, Mr. Myers will lose over $3,090,610 and will struggle to find a job with comparable salary and benefits.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Age Discrimination Under the ADEA)

92.    Mr. Myers repeats and realleges each and every prior allegation made in paragraphs 1 through 91 as if fully set forth herein.

93.    Defendants have unlawfully violated the ADEA, resulting in the discriminatory treatment of John O. Myers, based solely on his age.

94.    At least sixty (60) days has passed since Mr. Myers filed a charge alleging unlawful age discrimination with the Equal Employment Opportunity Commission ("EEOC") on February 28, 2007, and the EEOC has not taken any action with respect to Mr. Myers's claim.

95.    Mr. Myers, was 59 years old and was a member of a protected class when he was subject to an adverse employment action by HSBC, namely his unlawful termination.

96.    Prior to his unlawful termination, Mr. Myers satisfactorily performed his job, was qualified for his position, and was qualified for all subsequent open positions at HSBC for which he applied and was denied.

97.    The circumstances surrounding Mr. Myers's termination and refusal for further employment within HSBC, in addition to the blatantly discriminatory comments made to Mr. Myers, give rise to an undoubtable inference of age discrimination based upon Mr. Myers's membership in a protected class.

98.    HSBC knowingly, wilfully and intentionally discriminated against Mr. Myers, with malice and reckless indifference to Mr. Myers's federally and locally protected rights..

99.    Mr. Myers's age played a significant role in HSBC's decision making process and had a determinative outcome on his loss of employment and denial of continued employment with

HSBC.

100.    As a direct and proximate result of HSBC's unlawful actions, Mr. Myers has been directly damaged in an amount to be proven at trial, but in an amount not less than $3,090,610, plus attorneys' fees.

### AS AND FOR A SECOND CAUSE OF ACTION
### (Age Discrimination Under the Executive Law)

101.    Mr. Myers repeats and realleges each and every prior allegation made in paragraphs 1 through 100 as if fully set forth herein.

102.    By the acts and practices described above, defendants discriminated against Mr. Myers in violation of the Executive Law.

103.    HSBC knowingly, wilfully and intentionally discriminated against Mr. Myers, with malice and reckless indifference to Mr. Myers's federally and locally protected rights.

104.    Mr. Myers is now suffering and will continue to suffer monetary damages and damages for mental anguish, emotional distress, and humiliation as a result of defendants' discriminatory acts.

105.    As a direct and proximate result of these actions, Mr. Myers has been directly damaged in an amount to be proven at trial, but in an amount not less than $3,090,610, plus damages for mental anguish, emotional distress, and humiliation.

### AS AND FOR A THIRD CAUSE OF ACTION
### (Age Discrimination in Violation of the Administrative Code)

106.    Mr. Myers repeats and realleges each and every prior allegation made in paragraphs 1 through 105 as if fully set forth herein.

107.    By the acts and practices described above, defendants discriminated against Mr.

Myers in his unlawful termination in violation of the Administrative Code.

108.    Defendants knowingly, wilfully and intentionally discriminated against Mr. Myers with malice and/or reckless indifference to Mr. Myers's statutory rights.

109.    Mr. Myers is now suffering and will continue to suffer monetary damages and damages for mental anguish, emotional distress, and humiliation as a result of defendants' discriminatory acts.

110.    As a direct and proximate result of these actions, Mr. Myers has been directly damaged in an amount to be proven at trial, but in an amount not less than $3,090,610, plus damages for mental anguish, emotional distress, and humiliation, punitive damages in an amount exceeding $15 million, and attorneys' fees.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Unlawful Retaliation under the Title VII)

111.    Mr. Myers repeats and realleges each and every prior allegation made in paragraphs 1 through 110 as if fully set forth herein.

112.    Upon Mr. Myers's unlawful departure from HSBC, Mr. Myers was entitled to "good leaver" status, which entitled him to restricted shares in HSBC as they vested, valued at approximately $275,000, and entitled him to exercise, for varying periods after termination, 8,400 stock options that he holds, valued at approximately $21,104.

113.    Despite HSBC's representation to Mr. Myers on December 7, 2006 that he would be considered a "good leaver," HSBC later revealed that Mr. Myers's restricted stock award would not be released to him because he would no longer be considered a "good leaver." HSBC explained that Mr. Myers status as a "good leaver" was changed specifically because he had not signed an HSBC

24

Separation Agreement, and because he had "filed a claim against [HSBC]."

114.    HSBC unlawfully retaliated against Mr. Myers by, among other things, declaring that

he would no longer be considered a "good leaver," thus rescinding his entitlements to HSBC shares

and stock options, specifically because Mr. Myers opposed HSBC's unlawful discrimination, and

because Mr. Myers filed a charge of unlawful discrimination against HSBC, in accordance with the

ADEA, state, and local laws.

115.    Mr. Myers engaged in a protected activity, by properly filing a complaint of age

discrimination with the EEOC, as is his constitutionally protected right.

116.    Defendants were aware of that activity, because Mr. Myers expressed his intent to file

a charge with the EEOC, and the EEOC notified Defendants of the charge before HSBC denied Mr.

Myers "good leaver" status and refused to provide a promised excellent performance review.

117.    Mr. Myers suffered adverse employment actions, including being denied "good

leaver" status and refused a promised excellent performance review prior to his termination.

118.    The adverse actions relate to Mr. Myers's past employment relationship with

defendants and will adversely effect his relationship with potential employers.

119.    There is a causal connection between the protected activity and the adverse

employment actions.

120.    Defendants acted intentionally and with malice and/or reckless indifference to Mr.

Myers's statutory rights and with a retaliatory motive.

121.    As a result of defendants' discriminatory actions, Mr. Myers has suffered mental

anguish, emotional distress, and humiliation.

25

122.    As a direct and proximate result of these actions, Mr. Myers has been directly damaged in an amount to be proven at trial, but in an amount not less than $300,000, plus damages for mental anguish, emotional distress, and humiliation, punitive damages, and attorneys' fees.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Unlawful Retaliation under the ADEA )

123.    Mr. Myers repeats and realleges each and every prior allegation made in paragraphs 1 through 122 as if fully set forth herein.

124.    By the acts described above, defendants unlawfully retaliated against Mr. Myers in violation of the ADEA.

125.    Mr. Myers engaged in a protected activity, by properly filing a complaint of age discrimination with the EEOC, as is his constitutionally protected right.

126.    Defendants were aware of that activity, because Mr. Myers expressed his intent to file a charge with the EEOC, and the EEOC notified Defendants of the charge before HSBC denied Mr. Myers "good leaver" status and refused to provide a promised excellent performance review.

127.    Mr. Myers suffered adverse employment actions, including being denied "good leaver" status and refused a promised excellent performance review prior to his termination.

128.    The adverse actions relate to Mr. Myers's past employment relationship with defendants and will adversely effect his relationship with potential employers.

129.    There is a causal connection between the protected activity and the adverse employment actions.

130.    Defendants acted intentionally and with malice and/or reckless indifference to Mr.

26

Myers's statutory rights and with a retaliatory motive.

131.    As a direct and proximate result of these actions, Mr. Myers has been directly damaged in an amount to be proven at trial, but in an amount not less than $300,000, plus attorneys' fees.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Unlawful Retaliation under the Executive Law)

132.    Mr. Myers repeats and realleges each and every prior allegation made in paragraphs 1 through 131 as if fully set forth herein.

133.    By the acts described above, defendants unlawfully retaliated against Mr. Myers in violation of the Executive Law.

134.    Mr. Myers engaged in a protected activity, by properly filing a complaint of age discrimination with the EEOC, as is his constitutionally protected right.

135.    Defendants were aware of that activity, because Mr. Myers expressed his intent to file a charge with the EEOC, and the EEOC notified Defendants of the charge before HSBC denied Mr. Myers "good leaver" status and refused to provide a promised excellent performance review.

136.    Mr. Myers suffered adverse employment actions, including being denied "good leaver" status and refused a promised excellent performance review prior to his termination.

137.    The adverse actions relate to Mr. Myers's past employment relationship with defendants and will adversely effect his relationship with potential employers.

138.    There is a causal connection between the protected activity and the adverse employment actions.

27

139.    Defendants acted intentionally and with malice and/or reckless indifference to Mr. Myers's statutory rights and with a retaliatory motive.

140.    The adverse action relates to Mr. Myers's past employment relationship with defendants and will effect his relationship with potential employers.

141.    Mr. Myers is now suffering and will continue to suffer monetary damages and damages for mental anguish, emotional distress and humiliation as a result of defendants' retaliatory acts.

142.    As a direct and proximate result of these actions, Mr. Myers has been directly damaged in an amount to be proven at trial, but in an amount not less than $300,000, plus damages for mental anguish and humiliation.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### (Unlawful Retaliation under the Administrative Code)

143.    Mr. Myers repeats and realleges each and every prior allegation made in paragraphs 1 through 142 as if fully set forth herein.

144.    By the acts described above, defendants unlawfully retaliated against Mr. Myers in violation of the Administrative Code.

145.    Defendants acted intentionally, knowingly, wilfully and with malice and/or reckless indifference to Mr. Myers's statutory rights.

146.    Mr. Myers engaged in a protected activity, by properly filing a complaint of age discrimination with the EEOC, as is his constitutionally protected right.

147.    Defendants were aware of that activity, because Mr. Myers expressed his intent to file

a charge with the EEOC, and the EEOC notified Defendants of the charge before HSBC denied Mr. Myers "good leaver" status and refused to provide a promised excellent performance review.

148.    Mr. Myers suffered adverse employment actions, including being denied "good leaver" status and refused a promised excellent performance review prior to his termination.

149.    The adverse actions relate to Mr. Myers's past employment relationship with defendants and will adversely effect his relationship with potential employers.

150.    There is a causal connection between the protected activity and the adverse employment actions.

151.    Mr. Myers is now suffering and will continue to suffer monetary damages and damages for mental anguish, emotional distress, and humiliation as a result of defendants' discriminatory acts.

152.    As a direct and proximate result of these actions, Mr. Myers has been directly damaged in an amount to be proven at trial, but in an amount not less than $300,000, plus damages for mental anguish, emotional distress, and humiliation, punitive damages, and attorneys' fees.

## AS AND FOR A EIGHTH CAUSE OF ACTION
### (Promissory Estoppel)

153.    Mr. Myers repeats and realleges each and every prior allegation made in paragraphs 1 through 152 as if fully set forth herein.

154.    HSBC and its representatives made specific, material representations to Mr. Myers which were breached, including a series of unfulfilled promises regarding Mr. Myers's medical coverage. HSBC, in its separation package, promised Mr. Myers six months of COBRA coverage.

Subsequently, HSBC assured Mr. Myers that it would pay for two, then three months of coverage.

155.    Mr. Myers relied on the material representation that HSBC would pay for his COBRA coverage.  However, Mr. Myers was without medical and prescription coverage at various times from January to April 2007, despite promises that he would be covered, and then that his coverage would be reinstated when HSBC failed to extend his coverage in the first place.

156.    Because HSBC failed to keep its promises to Mr. Myers regarding his medical coverage, Mr. Myers incurred significant damages at his personal expense, at a time when he was without employment, in order to pay the premiums on the medical coverage so that his family would have medical coverage.

157.    As a direct and proximate result of these actions, Mr. Myers has been directly damaged in an amount to be proven at trial, but not in an amount less than $75,000,  plus attorneys' fees.

## AS AND FOR A NINTH CAUSE OF ACTION
### (Breach of Contract)

158.    Mr. Myers repeats and realleges each and every prior allegation made in paragraphs 1 through 157 as if fully set forth herein.

159.    HSBC has not followed its own guidelines established in its Human Resources Manual and on its website.  In the contract of employment entered into by HSBC and Mr. Myers, signed by Mr. Myers on June 18, 1999, HSBC promised that it would "always comply with the applicable law as well as with its policies as outlined in the Employee Manual and HSBC Asset Management Instruction Manual." By so stating, the contract of employment expressly incorporated the HSBC Employment Manual into its terms.

30

160.   HSBC breached its contract with Mr. Myers when, despite HSBC's stated policies that it values diversity, will not discriminate based on age, intends to employ the best candidate, prefers internal candidates for promotion, and only approves termination when all other options have been explored and rejected, it unlawfully terminated Mr. Myers's employment and refused to employ him elsewhere within HSBC despite his qualifications.

161.   HSBC also breached its contract with regard to COBRA medical coverage and his entitlement to "good leaver" status and his restricted stock options.

162.   As a result, Mr. Myers is 59 years old and without employment.  He will have significant difficulty finding a comparable job.

163.   As a direct and proximate result of these actions, Mr. Myers has been directly damaged in an amount to be proven at trial, but in an amount not less than $3,090,610.

**WHEREFORE,** Mr. Myers demands judgment as follows:

A.     On the First Cause of Action, based on age discrimination in violation of the ADEA, for damages to be determined at trial of this action, but in an amount not less than $3,090,610, exclusive of interest and costs, plus attorneys' fees;

B.     On the Second Cause of Action, based on age discrimination in violation of the Executive Law, for damages to be determined at trial of this action, but in an amount not less than $3,090,610, exclusive of interest and costs, plus damages for mental anguish, emotional distress, and humiliation;

C.     On the Third Cause of Action, based on age discrimination in violation of the Administrative Code, for damages to be determined at trial of this action, but in an amount not less

31

than $3,090,610, exclusive of interest and costs, plus damages for mental anguish, emotional distress, and humiliation, punitive damages in excess of $15 million and attorneys' fees;

D.     On the Fourth Cause of Action, based upon unlawful retaliation in violation of Title VII, for damages to be determined at trial of this action, but in an amount not less than $300,000, exclusive of interest and costs, plus damages for mental anguish, emotional distress, and humiliation, punitive damages, and attorneys' fees;

E.     On the Fifth Cause of Action, based upon unlawful retaliation in violation of the ADEA, for damages to be determined at trial of this action, but in an amount not less than $300,000 exclusive of interest and costs, plus attorneys' fees;

F.     On the Sixth Cause of Action, based upon unlawful retaliation in violation of the Executive Law, for damages to be determined at trial of this action, but in an amount not less than $300,000, exclusive of interest and costs, plus damages for mental anguish, emotional distress, and humiliation;

G.     On the Seventh Cause of Action, based upon unlawful retaliation in violation of the Administrative Code, for damages to be determined at trial of this action, but in an amount not less than $300,000, exclusive of interest and costs, plus damages for mental anguish, emotional distress, and humiliation, punitive damages, and attorneys' fees;

H.     On the Eighth Cause of Action, based on promissory estoppel, for damages to be determined at trial of this action, but in an amount not less than $75,000, exclusive of interest and costs;

I.     On the Ninth Cause of Action, based on breach of contract, for damages to be determined at trial of this action, but in an amount not less than $3,090,610, exclusive of interest and

costs;

    J.    Interest on all amounts awarded;

    K.    The costs and reasonable attorneys' fees incurred in prosecuting this action; and

    L.    Such other and further relief as the Court shall deem just and proper.

Dated: New York, New York
      May 24, 2007

                    FENSTERSTOCK & PARTNERS LLP

By:                                    

                Blair C. Fensterstock (BF 2020)

                30 Wall Street, 9th Floor
                New York, New York 10005
                (212) 785-4100
                *Attorneys for Plaintiff*